**Bernard J. KILEY, Sr., Petitioner**

v.

**UNITED STATES of America, Respondent**

**No. CIV.A. 97–30176–FHF.**

United States District Court, D. Massachusetts.

Feb. 13, 2003.

Bernard J. Kiley, Lewisburg, PA, Pro se.

Alan J. Black, Attorney at Law, Springfield, MA, for Petitioner.

Ariane D. Vuono, United States Attorney's Office, Springfield, MA, for Respondent.

### MEMORANDUM AND ORDER

FREEDMAN, Senior District Judge.

### I. INTRODUCTION

Acting *pro se*, Bernard Kiley, Sr. ("Kiley" or "petitioner") has moved this Court to vacate, set aside, or correct his federal prison sentence under 28 U.S.C. § 2255 ("section 2255"). Kiley requests relief on the grounds that his convictions stemming from the robbery of an armored car resulted from violations of his Fourth, Fifth, and Sixth Amendment rights. The petitioner

seeks a new trial or, in the alternative, additional discovery and an evidentiary hearing. The United States of America ("government") opposes the motion.

### II. FACTUAL AND PROCEDURAL BACKGROUND

The Court recites only those facts pertinent to Kiley's section 2255 petition and reserves a more detailed discussion for later. For a fuller rendition, see *United States v. Procopio*, 88 F.3d 21 (1st Cir. 1996).

#### A. *The Berkshire Armored Car Robbery*

On April 9, 1991, three armed and masked individuals held up a Berkshire Armored Car ("BAC") as it was being loaded in Pittsfield, Massachusetts. The robbers made off with $1.2 million in cash. Suspicious spending habits led law enforcement to the door of the petitioner, Bernard Kiley, as well as to Vincent Lattanzio, Donald Abbott, Francis Procopio, and Charles Gattuso. Among the search warrants obtained and executed, agents executing a search warrant at 79–81 Intervale Road in Brockton, Massachusetts ("Intervale search") discovered a cache of firearms and disguises.[1] Kiley's section 2255 petition bases most of its claims on the legality of and circumstances surrounding this particular search. The Court will discuss the factual and procedural history of the Intervale search momentarily.

For his part, a federal grand jury returned a superseding indictment charging Kiley with bank robbery, *see* 18 U.S.C. § 2113(a), conspiracy and interference with commerce by means of a bank robbery, *see* 18 U.S.C. § 1951, using a firearm

---

**1.** A total of eight search warrants relating to the Berkshire Armored Car robbery were obtained and executed, the first issuing on June 15, 1992, and the last issuing on June 8, 1993, for the Intervale location.

during the commission of a violent crime, *see* 18 U.S.C. § 924(c)(1), money laundering, *see* 18 U.S.C. § 1956(a)(1)(B)(i), aiding and abetting, *see* 18 U.S.C. § 2, and being a felon in possession of a firearm, *see* 18 U.S.C. § 922(g)(1). This Court severed the robbery charges from the firearms charges and ordered two separate trials.[2] The government introduced the weapons and disguises seized during the Intervale search at both trials, in the robbery trial as evidence of a "criminal association" between Kiley and Lattanzio, and in the firearms trial as evidence of Kiley's and Lattanzio's possession of firearms while being convicted felons. Two separate federal juries convicted Kiley and Lattanzio of all the counts listed previously.

On April 20, 1995, the Court sentenced Kiley to 45 years in prison and 5 years supervised release. The Court increased Kiley's sentence under the Armed Career Criminal Act of 1984 ("ACCA") for his possession of firearms, because he was previously convicted of a violent felony and two serious drug convictions. *See* 18 U.S.C. § 924(e). On appeal, the First Circuit affirmed the convictions. *See generally Procopio*, 88 F.3d 21. The Supreme Court denied Kiley's writ of certiorari less than a year later. *See Kiley v. United States*, 519 U.S. 1138, 117 S.Ct. 1008, 136 L.Ed.2d 886 (Feb. 18, 1997). Kiley initially petitioned this Court to vacate his sentence pursuant to section 2255 on August 14, 1997, *see* Motion to Vacate Sentence (Doc. No. 2), but has since amended and supplemented his motion numerous times.[3]

## B. *The Intervale Search*

The surveillance and search of 79–81 Intervale Street, a house with apartments on each of its three floors, in Brockton, Massachusetts, is of particular relevance to this petition. Most of the following comes from testimony at both trials.

Agents from the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS") placed Kiley under surveillance after several confidential informants implicated Kiley in the Pittsfield BAC robbery. On June 7, 1993, FBI Special Agent Gerald Downes ("Agent Downes") submitted to this Court an affidavit and application for a warrant to search what Agent Downes claimed to be Kiley's residence at 79 Intervale Road. The Court issued the warrant.

On June 8, 1993, a team of FBI and IRS agents went to 79–81 Intervale Road to execute the search warrant. The agents arrested Lattanzio outside of the house and entered the first floor, which was designated 79 Intervale Road, looking for Kiley. Once inside, the agents realized that the search warrant specified the wrong address, as another tenant was found inside that apartment. As a result of statements made to one of the agents, the search team proceeded up the back staircase to conduct a protective sweep of the apartments located upstairs. Stirred by shouts of "FBI," Kiley fled out of the third floor apartment and down the front staircase, where he was arrested by an agent waiting outside of the house. With Lattanzio and Kiley both in custody, the

---

**2.** Gattuso entered into a cooperation agreement with the government and became its star witness at Kiley's robbery trial. Abbott, who the government believed committed the robbery with Kiley and Lattanzio, also intended to turn into a government witness, but was murdered before trial. Kiley, Lattanzio, and Procopio were the defendants at the robbery trial; Kiley and Lattanzio were the defendants at the firearms trial.

**3.** The Court will consider every motion and memoranda Kiley has filed except for his original motion to vacate (Doc. No. 2), which he supplanted with an amended motion and supplements to the amended motion.

agents delayed the start of their search as arrangements were made to obtain a new search warrant specifying the correct address, which was 81 Intervale Road.

Agent Downes called IRS Agent Jessica Crocker, advising her that the search warrant needed to be changed to reflect the correct address. Crocker prepared a new affidavit and application and submitted them to this Court, which issued a new search warrant for 81 Intervale Road.

Armed with a new search warrant, the agents searched 81 Intervale. During the search, agents seized weapons, disguises, and other paraphernalia, all of which included a Massachusetts State Police Uniform, a mold for a State Police badge, two pairs of handcuffs, a bullet proof vest, two rubber masks, a Chinese assault rifle and ammunition, two Glock 9mm pistols, and fake identifications cards with pictures of Kiley and Lattanzio on them.

## C. *Kiley's Motion to Suppress Items Seized During the Intervale Search*

Among other pretrial motions, Kiley moved to suppress the items seized from Intervale search and moved for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (requiring a hearing when the defendant makes a "substantial preliminary showing" that the person attesting to the affidavit underlying a search warrant "knowingly and intentionally, or with reckless disregard for the truth," made a false statement). On April 19, 1994, this Court held a non-evidentiary hearing ("suppression hearing") on the matter. To bolster its position regarding the legality of the Intervale search, the government submitted a sworn declaration from Agent Downes which stated:

> On June 7, 1993, I applied for a warrant to search Bernard Kiley's residence at 79 Intervale in Brockton for documenta-

ry evidence of the expenditure of the BAC robbery proceeds. I knew that Kiley resided in the duplex where 79–81 Intervale was located because the FBI surveillance team informed me that they had Kiley under surveillance for eight successive days immediately preceding June 8, 1993, and the surveillance showed that Kiley routinely entered and exited the duplex as if he resided there. I was also aware that Kiley and Lattanzio were preparing to commit another armed robbery.

May 16, 1994 Memorandum and Order, at 36 n. 13 (Agent Downes' Declaration under Oath). Throughout the suppression hearing, the government represented to the Court that the FBI conducted "around the clock" surveillance during the eight days prior to June 8, 1993.

On May 16, 1994, the Court ruled that the 81 Intervale search warrant was deficient, holding that no probable cause to search 81 Intervale existed, as "nothing in the affidavit support[ed] the assumption that the house was Kiley's residence." *Id.* at 37. The Court, however, found that the "good faith" exception to the exclusionary rule saved the evidence. *See id.* at 37–38, *citing United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *see also Procopio*, 88 F.3d at 28, *quoting Leon*, 468 U.S. at 923, 104 S.Ct. 3405 ("*Leon* protects good faith police reliance on a magistrate search warrant, even if the warrant later proves invalid, unless *inter alia*, the underlying affidavit is 'so lacking in indicia of probable cause' as to make reliance upon it 'entirely unreasonable' "). Relying primarily upon Agent Downes' Declaration under Oath, the Court held that evidence suppression was unwarranted, because "Agent Downes was merely negligent, not dishonest or reckless, in failing to include [this] FBI-obtained information in [the] affidavit" sup-

porting the warrant application. *See* May 16, 1994 Memorandum and Order, at 38. The Court ruled that the evidence was admissible at trial and denied Kiley's request for a *Franks* hearing. *See id.* at 34–38.

The matter was settled until September 12, 1994, when the government disclosed numerous documents pursuant to the Jencks Act, including FBI Form 302 reports[4] related to the surveillance of 79–81 Intervale Road ("Intervale reports"). The reports themselves described only four days worth of surveillance at 79–81 Intervale Road, occurring only during business hours. In addition, the reports indicated that Kiley was seen only twice: the first time occurring on June 2nd, when he was seen helping Lattanzio remove a refrigerator, the other time on June 3rd, when he was seen leaving the house.

Reports in hand, Kiley moved for reconsideration of the suppression ruling and denial of *Franks* hearing, alerting the Court to discrepancies between the sporadic surveillance indicated in the newly disclosed surveillance reports and the "around the clock" surveillance alleged by Agent Downes in his Declaration under Oath and by the government in its representations to the Court. *See* Kiley's Exhibits, at 426–27 (Doc. No. 22) (Kiley's Motion for Reconsideration). Kiley maintained that the reports prove that Agent Downes did not have information which he claimed to have, namely, that Kiley resided at 81 Intervale. *See id.* at 427. Thus, Kiley argued, the Court could not predicate its decision on the agents' "good faith," as the Court had in denying Kiley's motion to suppress and motion for a *Franks* hearing. *See id.*

In a ruling issued just before the start of trial, the Court denied Kiley's motion for reconsideration, stating that:

> the Court . . . finds no reason to disturb its ruling regarding the search at 81 Intervale Street. In fine, Kiley wants the Court to conclude that, because no report was completed by the government agent on June 5th, 6th, and 7th, no surveillance was undertaken. However, the Court finds Kiley's speculation too tenuous to countermand its earlier "good faith" determination.

Sept. 19, 1984 Memorandum and Order, at 10. The fruits of the Intervale search being admissible, the government introduced those items at the robbery trial to show a criminal association between Kiley and Lattanzio, and at the firearms trial to show their possession of firearms. As mentioned previously, the juries in both trials convicted Kiley of all counts.

### D. *Kiley's Appeal*

On appeal, the First Circuit considered the legality of the Intervale search *de novo* and also found that the *Leon* good faith exception to the exclusionary rule applied. *Procopio,* 88 F.3d at 28. The First Circuit elaborated:

> In this instance, the [affidavit underlying the second search warrant] recited that agent Downes had advised that he was "at Bernard Kiley's address at 81 Intervale . . . ." Thus, the affidavit included the agent's assertion that the address to be searched (81 Intervale) was that of suspect (Kiley) as to whom probable cause had been shown; the only omission was the failure to explain how the agent—who had ample basis for the contention—knew that "81 Intervale" was

---

4. An FBI Form 302 is a written report which an agent compiles from notes taken contemporaneously during a surveillance or an interview of a suspect or witness. In the case of an interview with a suspect or witness, the suspect or witness does not have the opportunity to review the Form 302 for accuracy.

"Kiley's address." Whether or not this is a defect in the application, it is hardly blatant, nor is there any suggestion (or basis for a suggestion) or actual bad faith. Thus, we conclude that *Leon* applies.

*Id.* In his appellate brief, Kiley brought the discrepancies between the Intervale reports and the government's representations of "around the clock" surveillance to the attention of the First Circuit. *See* Government's Opposition to Motion, Exhibit B (Kiley's Appellate Brief). The First Circuit rejected his argument. *See Procopio*, 88 F.3d at 28 ("Whether or not this is a defect in the application, it is hardly blatant, *nor is there any suggestion (or basis for a suggestion) or actual bad faith.*") (emphasis added).

Kiley now seeks to brim over the canyons of speculation with floods of newly discovered evidence that the government actually knew he resided at 50 Clarence Street in Brockton, Massachusetts, and not Intervale Road as the government represented. Kiley argues that he can show that the government obtained the warrant in bad faith, and asks this Court to grant him relief, including full discovery and an evidentiary hearing on the matter, as well as new trials on the robbery and firearms charges. Kiley also asks the Court to vacate his sentence or to resentence him without considering the ACCA.

## III. LEGAL STANDARDS

### A. *Section 2255 Relief*

As a federal prisoner, Kiley may move to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, upon the grounds that (1) the Court imposed his sentence in violation of the Constitution or laws of the United States, (2) the Court lacked jurisdiction to impose his sentence, (3) his sentence exceeded the maximum authorized by law, or (4) his sentence is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255; *Knight v. United States*, 37 F.3d 769, 772 (1st Cir.1994) (outlining grounds upon which federal prisoner may claim relief under 28 U.S.C. § 2255).

Kiley brings numerous claims in his 254 pages of motions and memorandums, *see* Amended Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 ("Kiley's Amended Motion") (Doc. No. 20), Reply to the Government's Response ("Kiley's Reply") (Doc. No. 34), Motion for Leave to Supplement the Amended Motion (Doc. No. 35), and Motion for Leave to Reply to Government's Response to Motion for Leave to Supplement the Amended Motion (Doc. No. 38), which he supports with no less than 616 pages of exhibits, *see* Appendix of Exhibits ("Kiley's Exhibits") (Doc. Nos. 21, 22).[5] Although Kiley's arguments are often entangled and intertwined, the Court will try its best to sort out and decipher the claims of which his filings provide sufficient notice.[6] *See Prou v. United States*, 199 F.3d 37, 42 (1st Cir.1999); *see also Raineri v. United States*, 233 F.3d 96, 97 (1st Cir. 2000) ("The federal courts historically have been solicitous of the rights of pro se litigants.").

Kiley's claims are predominantly constitutional, as he alleges that the government has failed or has continued to fail to disclose material and exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S.

---

**5.** The Court will treat these filings collectively as "the 2255 petition."

**6.** The organization of this Memorandum and Order deviates from the organization of Kiley's motions; the Court enumerates the claims in the manner it finds most conducive to deciding them.

83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Kiley also asserts three constitutional claims alleging that he was improperly sentenced. These claims all appear properly raised in a section 2255 petition. *See Knight,* 37 F.3d at 772. The Court wearily eyes one of Kiley's passing arguments involving a Fourth Amendment claim, since it is improperly raised in this petition. *See Owens v. United States,* 236 F.Supp.2d 122, 133–38 (D.Mass.2002).

## B. *The Brady Framework*

■ A prosecutor's duty to disclose evidence favorable to the accused is not absolute. Due process does not require the prosecutor "to deliver his [or her] entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial .…" *See United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "If suppression of evidence results in constitutional error, it is because of the character of the evidence .…" *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *see also Brady,* 373 U.S. at 87, 83 S.Ct. 1194 (prosecutor's good faith or bad faith in failing to disclose material evidence is irrelevant in deciding whether *Brady* violated).

■ Due process ultimately requires the prosecutor to disclose only that evidence which is "material" to the accused's guilt or punishment. *See Brady,* 373 U.S. at 87, 83 S.Ct. 1194. In *Bagley,* the Supreme Court explained that,

> evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. For example, undisclosed evidence which reveals that the government introduced testimony at trial that it knew or should have known was perjured constitutes "fundamental unfairness" which undermines the outcome of a trial or proceeding. *Agurs,* 427 U.S. at 104 n. 7, 96 S.Ct. 2392, *construing Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). *See also United States v. Gonzalez–Gonzalez,* 258 F.3d 16, 21 (2001) ("[W]e think it is sufficiently analogous that the *Brady* error rule should apply to claims of knowing use of perjured testimony.").

In attempting to show a *Brady* violation, the petitioner need not demonstrate that disclosure of the undisclosed evidence would have resulted in acquittal. *See Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). As the Supreme Court enunciated:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines the confidence in the outcome of the trial."

*Id.* (citations omitted). Second, the petitioner only has to show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 425, 115 S.Ct. 1555. Third, this Court does not need to determine whether such suppressing material evidence was harmless, because a *Bagley* error is per se harmful. *Id.* at 436, 115 S.Ct. 1555. Lastly, the Court must examine the materiality of suppressed evidence collectively rather

then individually. *Id.* at 436–37, 115 S.Ct. 1555.

■ In sum, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either wilfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

## C. *Remedial Framework*

Throughout his section 2255 petition, Kiley requests numerous forms of relief, invoking a host of different legal standards. The Court will bear in mind the following standards when considering Kiley's substantive claims. *Cf. Bracy v. Gramley,* 520 U.S. 899, 904–05, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997).

### 1. *Full Discovery*

■ "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Id.* at 904, 117 S.Ct. 1793. Discovery in section 2255 proceedings is available only "if, and to the extent that, the [Court] in the exercise of [its] discretion and for good cause shown grants leave to do so, but not otherwise." R. 6(a) of Rules Governing Section 2255 Proceedings. *See Bracy,* 520 U.S. at 905–10, 117 S.Ct. 1793 (finding "good cause" for discovery where petitioner specifically alleged that judge who presided over his murder trial took bribes in other cases and that petitioner's trial attorney, a former associate of the judge, may have rushed the petitioner's case to trial to deflate suspicion surrounding bribe scheme).

■ The Court must identify the "essential elements" of Kiley's claims and then determine whether the factual allegations of which Kiley seeks discovery sufficiently satisfy the elements of those claims. *See id.* at 904–05, 117 S.Ct. 1793. If Kiley makes specific allegations that "show [a] reason to believe that [he] may, if the facts are developed, be able to demonstrate that he is ... entitled to relief, it is the duty of [this Court] to provide the necessary facilities and procedures for an adequate inquiry." *Id.* at 905–10, 117 S.Ct. 1793, *quoting Harris v. Nelson,* 394 U.S. 286, 300, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969).

### 2. *Evidentiary Hearing*

■ In determining whether Kiley is entitled to an evidentiary hearing, the Court looks first to the language of section 2255, which provides:

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

28 U.S.C. § 2255. The burden of proving the need for an evidentiary hearing to resolve this section 2255 petition falls squarely on Kiley's shoulders, *see, e.g., United States v. McGill,* 11 F.3d 223, 225 (1st Cir.1993), and he shoulders that burden by a preponderance of the evidence, *see Myatt v. United States,* 875 F.2d 8, 11 (1st Cir.1989). Where the record, motions, and supporting documentation demonstrate there to be a genuine issue of material fact, the Court must hold an evidentiary hearing. *See United States v. DiCarlo,* 575 F.2d 952, 954 (1st Cir.1978); *but cf. McGill,* 11 F.3d at 226 ("That undisputed facts may plausibly be interpreted in different ways does not entitle

an interested litigant to an evidentiary hearing."). The language of section 2255 however, "does not strip the [Court] of all discretion to exercise [its] common sense." *Machibroda v. United States,* 368 U.S. 487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). An evidentiary hearing is unnecessary, if the section 2255 petition is either facially inadequate or, though facially adequate, contains factual allegations that are conclusively refuted by files and records of the case. *See Moran v. Hogan,* 494 F.2d 1220, 1222 (1st Cir.1974).

▉▉▉ Accordingly, the Court will accept as true those factual allegations in Kiley's petition that are supported by competent evidence which would be admissible at an evidentiary hearing. *See Barrett v. United States,* 965 F.2d 1184, 1195 (1st Cir.1992), *quoting United States v. Aiello,* 814 F.2d 109, 113 (2d Cir.1987) ("To warrant plenary presentation of evidence, the application must contain assertions of fact that a petitioner is in a position to establish by competent evidence.") *and Dalli v. United States,* 491 F.2d 758, 760 (2d Cir. 1974) (In determining whether a hearing is necessary, "the court looks primarily to the affidavit or other evidence proffered in support of the application in order to determine whether, if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief."). The Court need not accept as true those factual allegations that are conclusory, inherently incredible, or refuted by facts in the record. *See Shraiar v. United States,* 736 F.2d 817, 818 (1st Cir.1984); *McGill,* 11 F.3d at 225 ("the [Court] must take many of petitioner's factual averments as true, but the [Court] need not give weight to conclusory allegations, self-interested characterizations, discredited inventions, or opprobious epithets"). The Court will test the adequacy of Kiley's remaining "factual allegations by assuming *arguendo* their truth, and then assessing their suffi-

ciency in light of the relevant constitutional standards and the record." *Moran,* 494 F.2d at 1222. Because both of Kiley's trials were conducted in the reviewing judge's courtroom, the Court is also "at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing." *McGill,* 11 F.3d at 225.

### 3. *Standards for New Trial*

The First Circuit has not definitively addressed whether "newly discovered evidence is a cognizable ground for obtaining a new trial" under section 2255. *Barrett,* 965 F.2d at 1194–95; *cf. Grace v. Butterworth,* 586 F.2d 878, 880 (1st Cir.1978) ("It may be assumed that a compelling claim for relief might be presented when newly available evidence conclusively shows that a vital mistake had been made."); *but see Cruz–Sanchez v. Rivera–Cordero,* 835 F.2d 947, 948–49 (1st Cir.1987) ("it is not even clear that newly discovered evidence is a ground for section 2255 relief"). "At a minimum," however, Kiley must "meet the conventional criteria for obtaining a new trial on the ground of newly discovered evidence." *Barrett,* 965 F.2d at 1194–95. Accordingly, the Court turns to the jurisprudence in this circuit.

▉▉▉ In the ordinary situation governed by Fed.R.Crim.P. 33, the First Circuit expounded the test for granting a new trial based on newly discovered evidence:

A motion for new trial on the basis of newly discovered evidence will ordinarily not be granted unless the moving party can demonstrate that: (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cu-

mulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant.

*United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir.1980). Thus, a defendant seeking a new trial on the basis of newly discovered evidence must satisfy the first three prongs of the *Wright* test and then show that "the evidence must create an *actual probability* that an acquittal would have resulted if the evidence had been available." *United States v. Sepulveda*, 15 F.3d 1216, 1220 (1st Cir.1993) (emphasis added). This same "defendant-onerous" standard, *Gonzalez–Gonzalez*, 258 F.3d at 20, also governs motions for new trial based on newly discovered evidence that the government "unwittingly" used perjured testimony. *See United States v. Huddleston*, 194 F.3d 214, 221 (1st Cir.1999) (conviction "should stand unless the force of the newly discovered event (i.e., the fact and nature of the perjury) and the content of the corrected testimony are such that an acquittal *probably* would result upon retrial") (emphasis added).

▮ The "actual probability of acquittal" standard tucked into the forth prong of the *Wright* test is inapplicable to two particular situations, however. *See Gonzalez–Gonzalez*, 258 F.3d at 21. The first involves situations where the government violates its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See United States v. Josleyn*, 206 F.3d 144, 151–52 (1st Cir.2000). Under such circumstances, a more "defendant-favorable" standard is in order. *See id.,quoting Kyles*, 514 U.S. at 434, 115 S.Ct. 1555 (a new trial is warranted where the government's non-disclosure deprives the defendant of a "fair trial, understood as a trial resulting in a verdict worthy of confidence"). Hence, upon satisfying the first three prongs of the *Wright* test, the defendant must only show that there is a "*reasonable probability* that the missing evidence would have changed the result" of the trial. *Gonzalez–Gonzalez*, 258 F.3d at 22 (emphasis added) (quotations omitted).

▮ The second involves situations where the government knowingly uses perjured testimony at trial. *Id.* In such circumstances, upon satisfying the first three prongs of the *Wright* test and making a "colorable claim that the government knowingly used perjured testimony," *see id.* at 22 n. 1, the standard is whether there is a "*reasonable likelihood* that the false testimony could have affected the judgment of the jury." *Id.* at 22 (emphasis added). The First Circuit has pronounced these two standards of "reasonability" with the same inflection. *See id.* ("Although the Supreme Court has not described whether there is a difference between the 'reasonable likelihood' and 'reasonable probability' standards, we believe they are equivalent."). "In the end, both standards are concerned with whether [the defendant] received a fair trial resulting in a verdict worthy of confidence." *Id.*

### 4. *Analytical Framework*

Before delving into the substantive claims involved, the Court pauses a moment to settle one preliminary, analytical issue. In his section 2255 petition, Kiley asserts a number of what he deems to be *Brady* claims. Kiley's characterization of some of these claims as *Brady* claims, however, is a slight misnomer, as some are better labeled requests for discovery and an evidentiary hearing.[7] Thus, the Court

---

**7.** Of course, the seeds of discovery may eventually blossom into a *Brady* claim, and the *Brady* framework is relevant to determining whether to grant Kiley discovery. *See Bracy*, 520 U.S. at 904–05, 117 S.Ct. 1793. At this

will place each claim into its appropriate categories, analyzing it under its respective framework.

Accordingly, where Kiley argues that the government violated his right to due process by failing to disclose evidence that was available to the government and material to Kiley's guilt or sentencing, Kiley asserts a traditional *Brady* claim. *See Brady*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. These untimely disclosed documents, known actually to exist, include the Intervale surveillance reports as well as the Pittsfield Police Department reports which Kiley only recently requested and obtained. *See* Kiley's Exhibits (Doc. No. 21), at 76–84, (Doc. No. 22), at 526–92; *see also Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 ("the individual prosecutor has duty to learn of any favorable evidence known to others acting on the government's behalf, including the police").

Likewise, where Kiley alleges certain evidence to exist, while lacking definitive proof that such evidence exists, Kiley makes only a request for discovery and an evidentiary hearing. *See* BLACK'S LAW DICTIONARY 478 (7th ed.1999) ("discovery" is "[t]he act or process of finding or learning something that was previously unknown"). The Court cannot perform the fact-intensive analysis that *Brady* contemplates, *see, e.g., Kyles*, 514 U.S. at 441–54, 115 S.Ct. 1555, without the evidence actually before the Court. Thus, the Court will refrain from speculating what precise *Brady* materiality this evidence might have. The evidence for which Kiley requests discovery and an evidentiary hearing includes the missing reports regarding the surveillance of 79–81 Intervale Road in Brockton, Massachusetts, any reports regarding the surveillance of 50 Clarence Street in Brockton, Massachusetts, any FBI 302 reports regarding interviews with Kerry

Pope and Richard Faulkner, and any evidence or reports concerning any other suspects of the BAC robbery. Additionally, Kiley requests discovery of evidence identifying anyone suspected by law enforcement of participating in an allegedly similar armored car robbery occurring in West Springfield, Massachusetts, years after Kiley was jailed for the BAC robbery in Pittsfield.

## IV. DISCUSSION

### A. *Issues Surrounding the Intervale Search*

As many of Kiley's claims are intertwined, the Court will first examine the issue regarding Kiley's residence in June of 1993, since many of Kiley's claims derive from his allegations that the government knew he resided somewhere other than 79–81 Intervale Road.

Among other things, Kiley alleges that the government failed to fulfill its disclosure obligation under *Brady* by failing to disclose the Intervale surveillance reports at the time his motion to suppress and his motion for a *Franks* hearing were litigated. Kiley posits that had such a disclosure been made, then the result of that pretrial suppression hearing would have been different. Kiley's argument is that the disclosure would have shown that the government lacked probable cause to search the Intervale location, which would have warranted suppression of the items seized there. Without that evidence, the government could not have established important links between Kiley and the crimes with which he was charged. Specifically, the government would not have been able to show a criminal association between Kiley and Lattanzio at the robbery trial, nor would the government have had firearms

moment, however, Kiley's assertion of these as *Brady* claims is premature.

with which to charge Kiley of possessing at the firearms trial. Kiley's ultimate argument is that he would have been acquitted of the robbery charges and there would have been no grounds upon which to charge him with possession of firearms had the government disclosed the Intervale reports at the suppression hearing.

Closely related to the *Brady* claims concerning the Intervale reports, Kiley also postulates that the government affirmatively misled this Court and the appellate court reviewing his robbery and firearms convictions. Specifically, Kiley alleges that, at the time his Fourth Amendment claims were litigated, the government: (1) failed to disclose the Intervale reports which showed spot check surveillance at that location and (2) instead substituted Agent Downes' misleading Declaration under Oath representing that the government conducted "around the clock" surveillance, (3) misrepresented to the Court the circumstances surrounding the Intervale surveillance, (4) knowingly used Agent Downes' perjured testimony at the detention hearing, (5) failed to fulfill its obligation to correct misrepresentations to the Court and Agent Downes' sworn testimony, and (6) failed to make disclosures about the surveillance which Kiley claims that the government conducted at 50 Clarence Street.

Kiley now submits various affidavits and other documents as "newly discovered" evidence which he believes support his theo-ry that the government knew he resided at 50 Clarence Street at the time of the Intervale search and acted in bad faith in obtaining, executing, and defending the Intervale search warrant before this Court and First Circuit. The government disputes the relevancy of this exercise, maintaining that this newly discovered evidence is irrelevant because the warrant was saved by the "good faith" exception to the warrant requirement, making the probable cause determination irrelevant. The Court observes, however, that the First Circuit upheld the validity of the Intervale search based, in part, upon the lack of blatant omissions in the second search warrant application and the lack of "any suggestion (or basis for a suggestion) of actual bad faith" on the part of the government.[8] *Procopio*, 88 F.3d at 28. The government also complains that Kiley has already litigated these issues and is now precluded from doing so again. *See Argencourt v. United States*, 78 F.3d 14, 16 (1st Cir.1996) (2255 petitioner "not free to relitigate" issues already decided on direct appeal); *United States v. Michaud*, 901 F.2d 5, 6 (1st Cir.1990) (claims "decided on direct appeal ... may not be relitigated under a different label on collateral review."). If Kiley is able to show grounds for discovery and an evidentiary hearing, then this section 2255 petition would prove to be his first full and fair opportunity to litigate the issues surrounding the Intervale search.[9] As the following discussion

---

**8.** The First Circuit found the "only omission [in the second Intervale warrant to be] the failure to explain how [Agent Downes]—*who had ample basis for the contention*—knew that '81 Intervale' was 'Kiley's address.'" *Procopio*, 88 F.3d at 28 (emphasis added). Presumably, Kiley is attempting to attack the "ample basis" upon which Agent Downes bases his knowledge of Kiley's residence.

**9.** This case calls for a slightly dissimilar approach than the one adopted in *Owens v.* *United States*, 236 F.Supp.2d 122, 133–38 (D.Mass.2002). The section 2255 petitioner in that case brought to the attention of the district court the government's nondisclosure of evidence relevant to a suppression hearing in a motion to reconsider the district court's denial of his motion to suppress. The petitioner also brought the evidence to the attention of the First Circuit on direct appeal. The district court applied the reasoning in *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), and ruled that the peti-

elucidates, however, Kiley's grounds for discovery and an evidentiary hearing are but a delicate pile of postulates, the more to which he adds, the more it waivers and unsteadies. As will soon become apparent, a soft breeze of logic blows his pile of suppositions over.

## B. *Requests for Discovery and an Evidentiary Hearing*

### 1. *Newly Discovered Evidence*

■ The first affiant whom Kiley presents is Kerry M. Pope, a longtime friend. *See* Kiley's Exhibits (Doc. 21), at 269 (Pope Aff.). Pope attests that, in late April of 1993, he and Richard Faulkner were arrested by the Boston Police for attempting to cash a fraudulent check. *See id.* at 270. Pope reports that during this arrest in late April of 1993, FBI agents interrogated him about his relationship with Kiley. *See id.* Pope claims that these unnamed FBI agents admitted to him in late April of 1993 that the FBI had placed Kiley's residence at 50 Clarence Street under surveillance during April and May of 1993. *See id.* at 270–71. After being asked whether he knew anything about the 79–81 Intervale Road house, Pope attests that he told the agents that he knew nothing about the Intervale Road house, and reiterated that Kiley resided at 50 Clarence Street.

Kiley also submits the affidavit of Richard Faulkner, another longtime friend. *See* Kiley's Exhibits (Doc. No. 21), at 272–74 (Faulkner Aff.). Faulkner attests that he shared an apartment with Kiley on the third floor of 50 Clarence Street from late October of 1992 until Faulkner was arrested with Pope for attempting to cash a fraudulent check. *See id.* at 272. In paragraph 4 of his affidavit, Faulkner twice attests that this arrest occurred in late April of 1992; in paragraph 6 of his affidavit, he attests that this arrest occurred in late April of 1993. *See id.* at 272. Faulkner continues, stating that the FBI agents knew Kiley resided at 50 Clarence Street because they told him at that April 1993 interrogation that the FBI had placed the Clarence Street house under surveillance during the entire time Faulkner and Kiley lived there. *See id.* at 274. Faulkner also claims that "to the best of [his] knowledge," Kiley resided at the Clarence Street house until Kiley was arrested in June of 1993. *See id.* at 273.

Lastly, Kiley submits the laconic affidavit of Theresa Coffey, a "close and intimate friend" of Lattanzio. *See* Kiley's Exhibits (Doc. No. 21), at 161 (Coffey Aff.). Coffey attests that she visited Lattanzio at 79–81 Intervale Road in May and June of 1993. *See id.* These visits included overnight stays. *See id.* She also says that she knew Kiley and visited him at his 50 Clarence Street apartment several times during May and June of 1993. Kiley argues that these affidavits, coupled with the sporadic surveillance indicated by the Intervale reports, prove that he resided at Clarence Street and that the FBI knew he resided there at the time it applied for the Intervale warrants.

The Court finds that the evidence which Kiley submits and the conclusions he draws therefrom, while extensive, offer no inkling, suggestion, or inference that the government knew he lived at a place other than 79–81 Intervale Road. For the most

---

tioner, who had a full and fair opportunity to litigate his Fourth Amendment issue, was precluded from relitigating on collateral attack.

Here, Kiley claims to have newly discovered evidence *in addition to* the Intervale surveillance reports that were only disclosed after the suppression hearing. It cannot be said that Kiley has yet had a full and fair opportunity to litigate this issue if the Court grants him discovery and an evidentiary hearing, devices with which Kiley can fortify his arguments.

part, the submitted affidavits lack credibility and are conclusory, internally inconsistent, speculative, irrelevant, and contradicted by facts in the record. *See Shraiar,* 736 F.2d at 818 (claims which are inherently incredible or whose basis contradicts facts in the record may be denied without a hearing). The following discussion halts whatever favorable spin Kiley attempts to place on these affidavits.

First of all, the Court finds Pope's story entirely incredible. Pope attests that he related information to FBI agents that he could not possibly have possessed at the time the alleged interrogation occurred, namely, the place of Kiley's residence during the months *subsequent to* that very interrogation.[10] The Court dismisses Faulkner's story in the same vein, and again mentions that Faulkner's affidavit is patently riddled with internal inconsistencies. The Court also finds Faulkner's story irrelevant to the extent that any statement allegedly made to him by FBI agents regarding Kiley's residence at Clarence Street during the FBI interrogation alleged to have occurred in August of 1993 is completely irrelevant in determining where the government believed Kiley to reside in early June of 1993. The Court notes that while Kiley has produced a Form 302 report regarding an FBI interrogation of Pope conducted on August 4, 1993, *see* Kiley's Exhibits (Doc. No. 21), at 266–68 (Form 302 regarding Pope), Kiley has not come forward, nor has the government admitted to possessing, a similar report for the interrogation of Faulkner at that date. Pope makes no mention of this August interrogation in his affidavit; it is Faulkner who alleges in his affidavit to have been interrogated by the FBI in August. Frankly, these stories do not add up.

With respect to Coffey, she is a witness who admits that her very presence in the apartment, by virtue of her intimate relationship with Lattanzio, causes other people to be absent from that very apartment. *See* Kiley's Exhibits (Doc. No. 21), at 161 (Coffey Aff.) ("Occasionally, Vincent and I stayed [at the Intervale apartment] overnight for privacy while my daughters stayed elsewhere."). Coffey's affidavit provides insufficient information to establish her as a person likely to possess personal knowledge of the government's awareness of Kiley's residence. *Cf.* Fed. R.Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has *personal knowledge* of the matter."); *Barrett,* 965 F.2d at 1195 (to warrant an evidentiary hearing, the petitioner must come forth with competent evidence). Given her association with Lattanzio, the mere statements that (1) she never saw Kiley at the Intervale apartment and (2) she only saw Kiley at Clarence Street, without more, are insufficient to rebut the evidence tending to show that Kiley lived at Intervale Road.

Were the Court to assume that Pope's and Faulkner's affidavits are true to the extent that Pope and Faulkner *believed* that Kiley lived at 50 Clarence Street until he was arrested in June of 1993, *see Myatt,* 875 F.2d at 11, their affidavits are unhelpful to the specific issue of the government's knowledge concerning Kiley's residence in early June of 1993. Lattanzio's father, the record owner of 79–81 Intervale Road, had not purchased the property until April 29, 1993, around the

---

**10.** Whatever the source of this incredibility, the Court notes in passing that the government introduced into evidence at Kiley's robbery trial a recorded conversation between Pope and Kiley, a pretrial detainee at the time, during which Kiley unambiguously asked Pope to lie about his financial dealings.

exact time during which these FBI interrogations are alleged to have occurred. *See* Kiley's Exhibits (Doc. 21), at 70 (John J. Lattanzio Aff.). Faulkner's affidavit corroborates testimony at trial that places Kiley in Arizona during that time. It is quite evident that Kiley could not reside at Intervale Road until after he returned from Arizona. Indeed, Pope and Faulkner most likely possessed personal knowledge of the place of Kiley's residence before the Intervale search. Yet Kiley's previous residences are logically irrelevant to the matter at hand, since the FBI only based its affidavits underlying the Intervale search warrant on surveillance at that location during the first week and a half of June 1993. Furthermore, Faulkner and Pope failed to attest that they were released from custody during this time. Thus, Pope and Faulkner fail to provide "foundational facts as to [their] personal knowledge" as well. *See Barrett*, 965 F.2d at 1195.

In short, the Court finds that none of these offers of proof refute the fact that Kiley resided, or exhibited objective behavior which made him appear to reside, at 79–81 Intervale Road. Kiley's briefs neglect to mention that Jo Putinjuano, the tenant who resided in the second floor apartment at 81 Intervale Road, testified at trial that she observed Kiley acting in a way consistent with that of a resident at the Intervale house:

Q: Regarding the third floor there, did you see any tenants or any activity regarding the third floor during those first eight days of June?

A: Just one that appeared to be sleeping over. I wasn't sure if he was living there or not; I didn't ask.

Q: How many times did you see someone in the third floor apartment?

A: Twice.

Q: Do you know who that individual was?

A: I just know him as Bernie.

Kiley's Exhibits (Doc. No. 21), at 177 (Testimony of Jo Putinjuano). Again, nothing Kiley offers contradicts this notion.

Kiley seeks "to conduct broad-scale discovery in hopes of establishing his claim" that the government acted in bad faith with regard to the Intervale warrant, "and request[s] what would ... amount to a full-scale evidentiary hearing on [the matter]." *DeVincent v. United States*, 632 F.2d 145, 146 (1st Cir.1980). The Court, however, refuses to entertain such a "fishing expedition." *Id.* (denying evidentiary hearing in 2255 petition where petitioner failed to present proof of his allegations and relied upon mere speculation); *Strickler*, 527 U.S. at 286, 119 S.Ct. 1936 ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review").

Simply put, the affidavits Kiley submits do not prove what he thinks they prove. *Cf. McGill*, 11 F.3d at 226 ("That undisputed facts may plausibly be interpreted in different ways does not entitle an interested litigant to an evidentiary hearing."). Kiley's evidence contradicts facts established in the record and his conclusions are extremely speculative. In the end, Kiley offers "no proof of his allegation" that the government knew he resided at 50 Clarence Street, *DeVincent*, 632 F.2d at 146, but is left holding the same, discrepant Intervale surveillance reports which two courts have already considered. *See* May 16, 1994 Memorandum and Order, at 37 (denying Kiley's motion for reconsideration); Government's Opposition to Motion (Doc. No. 29), Exhibit B (Kiley's Appellate Brief pointing out the discrepancies between Intervale surveillance reports and Agent Downes' sworn statements); *Proco-*

*pio,* 88 F.3d at 28 (rejecting all of Kiley's grounds for appeal). The Court agrees with the government that Kiley is precluded from bringing this well-traveled claim before the Court once more. *See Argencourt,* 78 F.3d at 16; *Michaud,* 901 F.2d at 6. *See also Owens,* No. 236 F.Supp.2d 122, 133–38 (D.Mass.2002) (holding that section 2255 petitioner may not raise Fourth Amendment claims for which he or she has already had full and fair opportunity to litigate).

In sum, the Court finds that Kiley's claims regarding the Intervale search amount to no more than mere speculation, and he has failed to show good cause for additional discovery. *See* R. 6(a) of Rules Governing Section 2255 Proceedings. Kiley has also failed to convince the Court by a preponderance of the evidence that an evidentiary hearing is warranted. *See Shraiar,* 736 F.2d at 818; *McGill,* 11 F.3d at 225–26. Lastly, Kiley's reliance upon the affidavits of longtime friends, without explanation of how the information they provided was "unknown or unavailable" to him at the time his Fourth Amendment issues were litigated, is insufficient to warrant a new trial. *See Wright,* 625 F.2d at 1019. Accordingly, the Court will deny Kiley's request for discovery, an evidentiary hearing, and new trial with regard to all matters related to the Intervale search.[11]

### 2. *Allegations of Perjury and Misrepresentations to the Court*

■ As Kiley has not come forward with competent evidence tending to show that the FBI conducted surveillance at 50 Clarence Street, the ramifications to some of Kiley's other claims are ominous. Kiley alleges that the government (1) relied on Agent Downes' perjured testimony regarding the location and comprehensiveness of the FBI surveillance, (2) furthered that perjury with affirmative misrepresentations and misleading statements, and (3) failed to correct the testimony, misrepresentations, and statements before the warrant-issuing judge, trial judge, and appellate court after it became apparent that Agent Downes perjured himself.

As previously noted, Kiley has shown no grounds to believe that the FBI conducted surveillance at 50 Clarence Street. Thus, any claims alleging that Agent Downes lied about the location of surveillance must fail.[12]

The second claim of perjury involving Agent Downes' representations of the comprehensiveness of the surveillance (i.e. "around the clock" surveillance at 79–81 Intervale Road) and the government's reassertions of the same, requires slightly more discussion. Kiley interprets the spot-check surveillance indicated by the

---

**11.** Obviously, whatever *Brady* claims Kiley asserts with respect to the untimely disclosure of the Intervale surveillance reports and their effect at both of his trials must fail for the simple reason that the Intervale surveillance reports were available to Kiley at both trials. Additionally, Kiley's trial attorney skillfully brought the discrepancies in the Intervale reports to the jury's attention, therefore precluding any argument that the delayed disclosure hindered effective use of the evidence.

**12.** Briefly, the Court will discuss one minor point. Kiley argues that the government admitted to using perjured testimony when, during closing arguments at the firearms trial, it

conceded, "No witness testified in this case that he saw Mr. Kiley using firearms .... *In fact, no witness testified that he ever saw Mr. Kiley inside the third floor apartment at 81 Intervale [Road]."* Kiley's Amended Motion (Doc. No. 34), at 40 (government's closing arguments at firearms trial) (emphasis added). The question of whether the FBI observed Kiley entering and exiting the front door of the Intervale house during surveillance is entirely different than the question of whether anyone saw Kiley actually inside the third floor apartment. Further elaboration is unnecessary.

Intervale surveillance reports to contradict Agent Downes testimony that the FBI partook of regular surveillance during the eight days prior to the Intervale search. Issues of relitigation aside, *see Argencourt,* 78 F.3d at 16, the element of time once again works against Kiley's interpretation of the facts to reveal the flaws of his logic. Kiley concedes, as he must, that the Intervale surveillance reports were transcribed *after* Agent Downes' affidavit was submitted to the Court to secure the first search warrant and all but one of the Intervale reports were definitely transcribed *after* the Intervale search occurred.[13] Agent Downes testified at both trials that he himself was not involved in the surveillance, and it is obvious that he relied upon some source *other than* the Intervale reports to obtain information about the Intervale surveillance. In his Declaration Under Oath, Agent Downes stated that

I knew that Kiley resided in the duplex where 79–81 Intervale was located because *the FBI Surveillance team informed me* that they had Kiley under surveillance for eight successive days immediately preceding June 8, 1993, and the surveillance team showed that Kiley routinely entered and exited the duplex as if he resided there.

*See* May 16, 1994 Memorandum and Order, at 36 n.13 (Agent Downes' Declaration under Oath) (emphasis added). Not once did Agent Downes say he based his knowledge of the surveillance upon the actual reports.[14] Where it is apparent to the Court that law enforcement (both Agent Downes and the government) has played by the book,[15] *see Bracy,* 520 U.S. at 909, 117 S.Ct. 1793 ("Ordinarily, we presume that public officials have properly discharged their official duties") (quotations and citations omitted), absent a plausible suggestion that Agent Downes perjured

---

13. Most of the very reports upon which Kiley relies to show the alleged discrepancies were not available at the time Agent Downes applied for the warrants. *See* Kiley's Exhibits (Doc. No. 21), at 76–84 (Intervale reports). While the first report of the surveillance conducted on June 1st was transcribed on June 8th, a day after Agent Downes' applied for the first Intervale warrant, and the same day of the Intervale search, *see id.* at 76–77, the remaining reports were each transcribed after the search occurred, *see id.* at 78–84. It is unclear whether the first Intervale report was transcribed in the hours before or after the search.

14. As the government explained, its statements before the Court during the suppression hearing "were based on information relayed to Agent Downes by other agents in Boston." *See* Kiley's Amended Motion (Doc. No. 34), at 46 (government's argument at suppression hearing).

15. While not probative as direct evidence, the government has argued, and this Court has adopted as true in light of the evidence presented at the pretrial hearings and both trials, that

... what the defense has suggested in all of their pleadings is that the government went off half-cocked at every turn in this investigation, that a sloppy investigation was conducted; that sloppy investigation resulted in flawed warrant applications, and in turn resulted in unconstitutional searches. And I would suggest to [the Court] respectfully that just the opposite is true in this case. And that this was an investigation conducted in a very deliberate, very methodical fashion over a long period of time.

... I would suggest to [the Court] that there were numerous occasions in this case where the agents could have opted for a shortcut. And chose not to. Instead, at every turn, they sought [the Court's] authorization by applying for a warrant when a warrant was necessary.

Kiley's Exhibits (Doc. No. 21), at 109–10 (government's summation during suppression hearing). While the Court notes that some of the government's representations surrounding the searches deviated slightly from the testimony eventually presented at trial, the gaps are not large enough to fill with claims that the government used perjured testimony or affirmatively misled the Court.

himself and that the government relied on that perjury, these claims must fail as well. *Compare id.* (presumption of official properly discharging duty rebutted by defense's highly specific allegations).

There is absolutely no suggestion other than Kiley's fantastic speculation that the government used false testimony and "contrived [his] conviction through the pretense of a trial." *Mooney*, 294 U.S. at 112, 55 S.Ct. 340. Without an untruth, there can exist no perjury, and Kiley's lack of substantive grounds for perjury means he is unentitled to discovery. *See Bracy*, 520 U.S. at 904–05, 117 S.Ct. 1793. Kiley has also failed to show a genuine issue of material fact which necessitates an evidentiary hearing. *See McGill*, 11 F.3d at 225. Lastly, because the Court finds there to be neither a colorable claim of perjury, *see Gonzalez–Gonzalez*, 258 F.3d at 22 n. 1, nor any possibility that an acquittal would result upon retrial, *see Huddleston*, 194 F.3d at 221, the Court will deny Kiley a new trial as well.

### 3. *West Springfield Armored Car Robbery*

■ Kiley's next discovery request draws the Court's attention to an undated newspaper article in the Boston Herald describing a subsequently occurring robbery of $1.6 million from the BAC vault in West Springfield, Massachusetts. *See Kiley's Exhibits* (Doc. No. 22), at 525. Kiley argues that this article, along with testimony at trial and some recently obtained police reports, show that the government failed to disclose material, exculpatory evidence. *See Brady*, 373 U.S. at 87, 83 S.Ct. 1194.

Kiley first points an eager finger at the alleged similarities between the Pittsfield BAC robbery and a robbery at the West Springfield BAC vault occurring on May 2, 1997. The similarities Kiley notes between the two robberies include the facts that:

1. Both robberies involved the early morning run between the Pittsfield and West Springfield vaults.

2. The BAC guards on duty during both robberies left the armored car they were loading outside, unattended, and filled with money at the BAC depot, in serious breach of BAC security procedures.

3. The robbers in both robberies appear to have been given inside information by BAC employees.[16]

Kiley links these similarities to testimony at trial in which Allan Mongeon, one of the BAC guards on duty, recounted hearing one of the robbers calling another "Chuck" during the course of the robbery. Kiley continues his detective work by postulating that the "Chuck" identified in recently obtained Pittsfield Police Department reports and the "Chuck" involved in the robbery are one in the same.

What Kiley dubs as distinct markings and the true perpetrator's calling card, however, are too generic for the Court to find a modus operandi at work here. The Boston Herald article offers the following, telling details of the West Springfield BAC robbery:

Authorities say thieves sneaked into the West Springfield yard of Berkshire Armored Car Services on May 2 just before dawn. Tipped to the cash delivery by a security guard and furnished with keys, they opened up an armored

---

**16.** The only information regarding the West Springfield BAC robbery before the Court is the Boston Herald article in Kiley's Exhibits. The Court notes that only the third similarity that Kiley alleges to exist between the two robberies is actually supported by the information contained in that newspaper article.

car, unloaded the cash, and then set off a smoke bomb inside.

Instead of creating a distraction, however, the smoke bomb actually alerted workers to the theft. Kiley's Exhibits (Doc. No. 22), at 525 (Boston Herald article). The differences between the robberies speak for themselves. Enlightening is fact that no witness to the West Springfield robbery reported seeing firearms; the article only mentions that no shots were fired during the course of the robbery. *See id.* In contrast, the Pittsfield BAC robbery was conducted at gunpoint. Granting Kiley's motion for discovery and an evidentiary hearing would only perpetuate a wild goose chase, which is something this Court is unwilling to do. As will soon become more apparent after the Court discusses the strong direct evidence introduced against Kiley, *see Procopio,* 88 F.3d at 31, the government's nondisclosure of information regarding the West Springfield BAC robbery could not have undermined the confidence in the outcome of Kiley's robbery trial. *See Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. Therefore, the Court will deny Kiley's request for discovery, *see Bracy,* 520 U.S. at 904–05, 117 S.Ct. 1793, an evidentiary hearing, *see McGill,* 11 F.3d at 225, and a new trial, *see Wright,* 625 F.2d at 1019, regarding this matter as well.

### C. *Pure Brady Claims*

Kiley alleges that the government violated *Brady* numerous times by failing to disclose material evidence which it had in its possession. This evidence includes a 118–page file from the Pittsfield Police Department ("PPD") containing information about the investigation of the Pittsfield BAC robbery conducted by various local law enforcement agencies. Kiley obtained these records pursuant to a request under the Massachusetts Public Records laws, Mass. Gen. Laws ch. 66, § 10(a).

### 1. *Ware Report*

The first document to which Kiley so excitedly alludes is the April 10, 1991 report of Massachusetts State Trooper Christopher D. Ware ("Ware report"). *See* Kiley's Exhibits (Doc. No. 22), at 528. The Ware report recites the details of a conversation Trooper Ware had with a person (the "informant") who arrived in a car later found to be registered to Colin Cadorette.[17] This informant stated that he was a former employee at BAC who once worked with a person known to him only as "Chuck." Apparently, Chuck was based out of the West Springfield vault. On many occasions a couple of years prior to the Pittsfield BAC robbery, Chuck remarked to the informant how easy it would be to take down the Pittsfield BAC vault, given its minimal security. The informant related to Trooper Ware that he was under the constant impression that Chuck was waiting for the informant to reciprocate interest in planning a robbery. Trooper Ware also observed that the informant emitted "a strong odor of an alcoholic beverage." There is another PPD report of Sargeant Harold E. Finn, Jr., reciting that he and Officer Murphy backed up Trooper Ware during the meeting with the informant. *See id.* at 529.

Kiley deems the Ware report to be material and exculpatory material under *Brady. See Brady,* 373 U.S. at 87, 83 S.Ct. 1194. Kiley notes that Allan Mongeon, one of the guards on duty during the robbery, testified at trial that he heard one of the robbers refer to another as "Chuck." At trial, Kiley tried to show that Chuck the robber was Charles Gattuso, the co-conspirator who opted to cooperate with the

---

**17.** It is unclear whether the informant was actually Colin Cadorette.

government. The government tried to rebut this inference by pointing out that Mongeon used to work with Gattuso, knew him well, and would have easily recognized his voice. Kiley now claims that suppressing the Ware report prevented him from talking with Mr. Cadorette and investigating this other suspect, effectively precluding his defense.

The government attacks Kiley's claim along two fronts. First, the government maintains that this report was disclosed to Kiley at trial. Second, the government also maintains that even if this report was used at trial, the jury would have convicted him nonetheless. *See Procopio,* 88 F.3d at 30 ("against Kiley, the evidence was strong"). Although persuaded by the government's first argument, the Court will leave the second argument for discussion in conjunction with Kiley's other *Brady* claim below. *See Kyles,* 514 U.S. at 436–37, 115 S.Ct. 1555 (cumulative impact of suppressed evidence is one aspect of materiality inquiry).

Kiley submits an affidavit from his trial attorney, Attorney Stewart T. Graham, Jr., attesting to the fact that Attorney Graham does not recall ever seeing these materials and does not now have them in his possession. *See* Kiley's Exhibits (Doc. No. 22), at 599–602 (Graham Aff.). Kiley submits an affidavit from Lattanzio's trial attorney, Attorney Kevin G. Murphy, attesting to the same. *See* Kiley's Reply (Doc. No. 34), Exhibit 1 (Murphy Aff.). Neither attorney alleges that the government actually failed to disclose the Ware report, but it is significant that neither indicated any knowledge of this report when presenting their cases at trial. *See Smith v. Sec'y of NM Dept. of Corrections,* 50 F.3d 801, 829–30 (10th Cir.1995) ("per-

haps the most highly probative evidence relating to" whether the report was disclosed "is the conspicuous absence of any cross-examination of [a certain witness,] on the matters contained in [the] report, matters that were extremely relevant to [the defendant's] defense"). These affidavits alone, however, do not prove that the Ware report was never disclosed, especially in light of the three documents the government submits.

The government has produced the very same Ware report which Kiley holds out as "newly disclosed," except the government's version is stamped as Jenkens Act material J01199 (Ware report) and 01200 (accompanying vehicle registration inquiry). *See* Government's Opposition (Doc. No. 29), Exhibits B and C. The government also provides a copy of a September 12, 1994 letter informing Kiley's trial counsel that the government was disclosing Jencks Act material numbered J00001 through J01406. Needless to say, the Ware report falls squarely within the range of disclosed documents. Lastly, the government also points to one of Kiley's pretrial motions, which cites Jencks Act material stamped J01242, filed on September 16, 1994, implying that Kiley received all documents numbered lower than J01242. These documents as a whole make it appear that the government disclosed the Ware report before trial. This inference is reinforced by the fact that, after having received consecutively numbered documents of Jencks Act importance, neither Kiley's attorney nor the attorneys for the other two defendants ever complained to the Court of incomplete disclosure with respect to the Jencks Act material, something at least one of the three attorneys surely would have done if documents were missing.[18] The Court is

---

18. Kiley also has not produced another document stamped with the same Jencks Act number as the Ware report to support an infer-

ence that the government is now attempting to cover up its nondisclosure of the Ware report.

satisfied that the government fulfilled whatever obligation the government had to disclose the Ware report.[19]

### 2. *Other PPD Reports*

Kiley submits numerous other documents he received from the PPD. After careful review of each one of the reports Kiley submitted, *see* Kiley's Exhibits (Doc. No. 22), at 526–92, the Court finds that each police document contains one of three types of information. The first type includes information already disclosed and known to Kiley at trial. The Court finds this evidence merely cumulative and, therefore, cannot serve as the basis of a *Brady* claim. *See United States v. Sanchez*, 917 F.2d 607, 618 (1st Cir.1990) ("newly discovered cumulative evidence could not undermine confidence in the fairness of the trial"). Thus, the Court will not consider this evidence in its discussion below. The second type of evidence that Kiley offers involves the reports of citizens implicating numerous people other than the defendants as the BAC robbers. Kiley claims that these reports are exculpatory in that they name other suspects the police investigated and that their nondisclosure denied him the chance to investigate the leads further to discover who the real BAC robbers were. The third type of evidence that Kiley offers includes police reports detailing the observation of various automobiles matching the description of the robbers' getaway car.

### 3. *Brady Analysis*

■ Assuming the government failed to disclose the Ware report, Kiley's *Brady* claims still fail,[20] as the direct evidence against Kiley was overwhelming.

Federal investigators were tipped off to Kiley's involvement in the BAC robbery by statements of confidential informants and by Kiley's suspicious spending habits. After the robbery, the five co-conspirators together managed to spend $328,681.81 on cars, boats, real estate, and vacations. At trial, the government called as its star witness, Charles Gattuso, who recounted in detail conversations he had with Kiley in which they hatched the plan for the heist. In March of 1991, Kiley telephoned Gattuso indicating that he wanted to discuss Gattuso's job with him. Around this time, Gattuso was fired from his job as a guard at BAC. The two met at a Dunkin Donuts, where Kiley revealed that he wanted to rob the Pittsfield BAC vault for 20 years. All Kiley needed, he said, was some inside information, which Gattuso agreed to provide, concerning schedules and security.

A week later, the two met again at Dunkin Donuts, and this time, Gattuso brought a friend, Frank Procopio. The three went for a drive in Kiley's Cadillac during which time they discussed plans to rob the Pittsfield BAC vault. Gattuso proposed robbing the BAC vault at 3:30 a.m., as the guards would be opening the door to load the armored car for early morning delivery. Kiley declared that he and two others who he did not name would do the robbery. All agreed that Procopio, a used car dealer, would provide and dispose of the getaway vehicle. The three confirmed these plans at a later meeting at Gattuso's home. Gattuso had little contact with Kiley thereafter.

Around 3:30 a.m. on April 9, 1991, BAC guards Allan Mongeon and James Cota were loading an armored car. The door to

---

**19.** For thoroughness, however, the Court will examine the materiality of the Ware report assuming, *arguendo*, the government never actually disclosed it.

**20.** While this Court seriously doubts that the government failed to disclose the Ware report, the Court will consider, *arguendo*, the *Brady* materiality of that report.

the BAC depot was open, and the armored car was parked outside the BAC depot, since another armored car was parked in the space inside, all in violation of BAC security procedures. As the guards were loading the car, three masked men brandishing weapons entered the BAC depot, forced the guards to the ground, took their weapons, hogtied them, and then removed over $1.2 million in cash. During the robbery, Mongeon testified that he heard one of the robbers refer to another as "Chuck." At trial, the government introduced evidence that "Chuck" was one of Kiley's aliases. The defense tried to show that "Chuck" was Charles Gattuso, who often went by that name. The government tried to rebut this implication, suggesting that had Gattuso been involved in the robbery, then Mongeon, who had worked with Gattuso previously, would have recognized Gattuso's voice easily.

Although the subdued guards could not identify the robbers, Mongeon saw the front fender of the getaway car and later identified a photograph of a light cream colored Plymouth Volare as the getaway car. The car Mongeon described was remarkably similar to the tan 1979 Buick Regal that Gattuso later testified was the actual getaway car that Procopio provided. Charles Parise's testimony revealed that Procopio hid the car with him. Parise testified that he objected at first but later agreed to hide the car and change its tires when Procopio threatened him.[21] Eventually, Procopio paid Parise $8,000 in cash for his help. When Parise agreed to cooperate with the government's investigation, he turned the money over to investigating agents. The government introduced this money at trial to corroborate the testimony.

Gattuso also recalled the events after the robbery. Procopio stayed in touch with Kiley and it was agreed that the robbery proceeds be split five ways. Procopio went to Boston to pick up his share and Gattuso's. Over time, Gattuso received $55,000 in cash from Procopio in separate installments. Gattuso spent the money on numerous transactions independently corroborated by witness testimony at trial. While Gattuso never inquired about the identities of the three robbers, Procopio communicated to Gattuso that he had met one of the robbers whose name was "Vinnie." When Procopio asked Kiley and Vinnie how much force was used during the robbery, Vinnie replied, "the [BAC guard] wouldn't stay down so I had to push him down."

Evidence also showed that Vinnie Lattanzio, a native of Brockton, checked into the Travel Lodge in Pittsfield on April 7th, two days before the robbery, and paid cash for a two night stay. Several witnesses at trial also testified that Kiley and Lattanzio were close friends who traveled together extensively after the robbery.

The government also introduced cash expenditures and investments made by Kiley, Lattanzio, and Procopio in the eight months following the robbery. These expenditures were wholly inconsistent with the group's legitimate sources of income, although the defendants attempted to show that the funds derived from other sources, such as gambling. With respect to Kiley, social security records showed that he had no wage income from 1986 to 1992. Kiley's brother testified that Kiley never had a legitimate job or a regular source of income. Nonetheless, Kiley managed to deposit over $55,000 in cash

---

**21.** Procopio told Parise, "It's not like you have a choice. Open your mouth and you'll eat a bullet. The guys that did this wouldn't think twice about walking in and killing anybody, you, your wife, anybody."

into twelve different accounts at five different banks in two different states. Many of the cash deposits were structured so as to avoid triggering the banks' obligation to report any cash transaction over $10,000.

The government also showed that Kiley insisted that his brother Donald Kiley opened a safe deposit box within three weeks of the robbery. Over $60,000 passed from Kiley through the safe deposit box and into accounts maintained by Donald. Also at Kiley's direction, Donald used a portion of those funds to purchase shares in The New England Growth Fund, a mutual fund held in Donald's name. The government contended that this allowed Kiley to invest robbery proceeds without revealing ownership and control of the funds. During the six months after the robbery, Kiley himself spent $30,000 in cash on travel, vehicles, and furniture.

Investigators executed numerous search warrants. During one search at Kiley's residence at 37 Taubert Avenue, Apartment 4, agents found:

1. bank records showing Kiley making deposits to multiple Florida accounts after the robbery;

2. a Wells Fargo armored car operating handbook;

3. a briefcase containing binoculars, walkie-talkie radios, and a police scanner;

4. travel records showing extensive European travel and Las Vegas junkets after the date of the robbery;

5. address books containing the numbers and addresses of Donald Abbott and Vincent Lattanzio;

6. handwritten financial records hidden in a stuffed animal reflecting Kiley's post-robbery financial transactions at Barnett Bank, City National Bank, and American Savings Bank in Florida, Multibank in Pittsfield and The New England Growth fund. One note in particular read "Vinnie—$21,000."

The fruits of another search, at 81 Intervale Road in Brockton, Massachusetts have already been described. The items seized during the Intervale search were limited to the purpose of showing a criminal association between Kiley and Lattanzio at the robbery trial.

Lastly, numerous tape-recorded conversations implicated Kiley. Among them were conversations in which Kiley asked numerous witness, including the previously-introduced Kerry Pope, Jack Roche, and Deborah Roucolet, to lie about certain financial transactions to mask Kiley's expenditure of large amounts of unexplained money. Other conversations between Gattuso and Procopio occurred where they discussed whether another co-conspirator cut a deal with the government. Lastly, in one other telephone conversation from Kiley and Lattanzio to Procopio, Procopio remarked that when their legal problems were behind them, they would "get back into business" and would "just [have] to be more careful about who [to] take with [them] from now on."

The evidence at trial presented a coherent story which Kiley does not now dispel. Testimony from the informant regarding his conversation with "Chuck" two years prior to the BAC robbery would not rebut the damning evidence against Kiley. The informant smelled of alcohol when he met with Trooper Ware and never followed up on his offer to meet with police again. Further, the informant's conversations with Chuck are vague, in that Chuck's intentions to rob the Pittfield BAC vault are rather ambiguous and half-hearted. The fact that the conversations occurred two years prior to the actual robbery dwindle their probative value further.

The Court finds the Ware report no more helpful to Kiley's cause than the numerous citizen's reports Kiley obtained from the PPD. In most of the citizens reports, the citizens describe hearing from people claiming to have been involved in the robbery or from someone else who heard someone take responsibility for the robbery. Several notes attached to these reports written by police convincingly discount the value of these early leads. While the Court does not require Kiley to come up with eyewitnesses to the crime, not one of the reports contains information helpful to link the alleged suspect to the crime. *See United States v. Stifel,* 594 F.Supp. 1525, 1541 (N.D.Ohio 1984) ("The burden on the defendant for purposes of this case is only to show that the prosecution's suppressed evidence could have created a reasonable doubt.").

At most, these reports recount post-robbery chatter and gossip without revealing anything indicative of genuine suspects. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Agurs,* 427 U.S. at 109–10, 96 S.Ct. 2392. While "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf ..., including the police," *Kyles,* 514 U.S. at 437, 115 S.Ct. 1555, the Supreme Court has never held that the Constitution requires "the prosecution [to] make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois,* 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

A review of the case law discussing undisclosed information concerning alternate suspects reveals that Kiley's reliance on these blind allegations are insufficient to support his *Brady* claims. *See Moore,* 408 U.S. at 795, 92 S.Ct. 2562 (no *Brady* violation where undisclosed evidence concerned another suspect, an early lead which police abandoned when eyewitnesses to the crime were found and it was determined that the suspect was mistakenly identified); *Pursell v. Horn,* 187 F.Supp.2d 260, 328 (W.D.Pa.2002) (there is no per se rule under *Brady* requiring government to disclose all evidence regarding other possible suspects); *Huber v. Schriver,* 140 F.Supp.2d 265, 275 (E.D.N.Y.2001) (no *Brady* violation where undisclosed evidence regarding a suspect who was not the petitioner included police reports classifying that other person as an "armed robbery suspect"). In every case that found undisclosed evidence about other suspects to be material under *Brady,* the courts found some plausible nexus linking the other suspect to the crime. *See Smith,* 50 F.3d at 829–30 (police report was material for *Brady* purposes, as it indicated that alternate suspect in double homicide investigation was "near the vicinity of the bodies on two separate occasions" and that bloody women's clothes were found in his trunk during a traffic stop); *Bowen v. Maynard,* 799 F.2d 593, 612–13 (10th Cir. 1986) (evidence was material for *Brady* purposes where it related to alternate suspect who was linked to organized crime and who had a more plausible motive and opportunity to commit the crime); *Mendez v. Artuz,* 2000 WL 722613, at *13 (S.D.N.Y.2000) (evidence of another suspect having equal opportunity yet a more compelling motive than petitioner was material for *Brady* purposes) (citing cases); *Jamison v. Collins,* 100 F.Supp.2d 647, 692 (S.D.Ohio 2000) (*Brady* violation where undisclosed evidence included statements by witnesses describing a person whose physical description varied greatly from petitioner's physique and clothing and a police report describing a person other than the

petitioner who matched the witness descriptions and who was later arrested in possession of wallet similar to wallet stolen during robbery); *Stifel*, 594 F.Supp. at 1541 ("The identity of the bomb sender was a question for the jury, and defendant should have been apprised of evidence showing that someone other than himself had equal motive, access to materials, and other surrounding circumstances implicating him as the guilty party."). The Court strains to find the same nexus here, given the overshadowing effect the direct evidence against Kiley and his co-conspirators has upon these elusive statements.

■ With respect to the police reports describing the observation of cars having an appearance similar to the getaway car described by security guard Mongeon, that information is immaterial as well. Not one report discusses a car that was similar in appearance to the getaway car, was found near the same vicinity, and was observed proximate enough in time to the crime; not one report indicates other suspicious circumstances that suggest a probative link. While prudence dictates that a prosecutor will avoid suppressing evidence whose materiality may be debatable, *Kyles*, 514 U.S. at 439, 115 S.Ct. 1555, failing to disclose these PPD reports, which the Court finds immaterial, did not amount to an exercise of poor judgment on the part of the government.

To reiterate, the direct evidence against Kiley was damning. This evidence included testimony by Kiley's co-conspirator, Charles Gattuso, who implicated Kiley as the mastermind of the robbery. The government supported its theory that Kiley was one of the BAC robbers with convincing and voluminous documentary evidence of Kiley's large post-robbery cash expenditures and testimony regarding Kiley's lack of reported income and job and his recent release from prison. Lastly, the recorded

conversations among the co-conspirators implicated Kiley.

When viewed in light of the evidence introduced at trial, nothing Kiley presents raises even fleeting fantasy that he received an unfair trial. In contrast, the Court remains convinced that Kiley is guilty of the crimes of which he was convicted beyond a reasonable doubt, *see Agurs*, 427 U.S. at 114, 96 S.Ct. 2392, and there is no reasonable probability that either of his trials would have resulted any differently had the government disclosed before trial any of the evidence to which Kiley alludes. *See Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. The government's nondisclosure did not undermine the confidence in the outcome of the trial, and therefore, the Court will deny all of Kiley's *Brady* claims. *See Kyles*, 514 U.S. at 434, 115 S.Ct. 1555.

## D. *Fourth Amendment Claim*

In a passing argument which he pursues without much elaboration, Kiley challenges the constitutional sufficiency of the 79–81 Intervale Road search warrant and the lawfulness of the accompanying search on the ground that the warrant was overly broad.

The Court concludes that Kiley is precluded from litigating this Fourth Amendment claim in his section 2255 petition. In *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court curtailed a state prisoner's ability to collaterally attack his or her sentence under 28 U.S.C. § 2254. While acknowledging that the rule excluding the fruits of searches and seizures that violated the Fourth Amendment serves a valiant purpose in deterring police misconduct, the Supreme Court found that, in context of habeas corpus petitions brought by state prisoners, the "contribution of the exclusionary rule, if any, to the effectuation of

the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force." *Stone*, 428 U.S. at 494–95, 96 S.Ct. 3037; *see also Arroyo v. United States*, 195 F.3d 54, 54–55 (1st Cir.1999). Thus, a state prisoner who has already had "an opportunity for full and fair litigation of a Fourth Amendment claim ... may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his [or her] trial." *Stone*, 428 U.S. at 494, 96 S.Ct. 3037.

▮ While the Supreme Court and the First Circuit have yet to extend the *Stone* rule to federal prisoners bringing section 2255 petitions, *see Arroyo*, 195 F.3d at 55 n. 1, the Supreme Court has hinted at doing as much:

> After *Stone*, the only cases raising Fourth Amendment challenges on collateral attack are those federal habeas corpus cases in which the State has failed to provide a state prisoner with an opportunity for full and fair litigation of his claim, *analogous federal cases under 28 U.S.C. § 2255*, and collateral challenges by state prisoners to their state convictions under postconviction relief statutes that continue to recognize Fourth Amendment claims.

*United States v. Johnson*, 457 U.S. 537, 563 n. 20, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982) (emphasis added). Indeed, many courts have found *Stone*'s reasoning to apply equally to section 2255 petitions. *See United States v. Cook*, 997 F.2d 1312, 1317 (10th Cir.1993); *United States v. Hearst*, 638 F.2d 1190, 1196 (9th Cir.1980); *Owens v. U.S.*, 236 F.Supp.2d 122, 133–38 (D.Mass.2002); *Coneo–Guerrero v. United States*, 142 F.Supp.2d 170, (D.P.R.2001); *Santiago–Lugo v. United States*, 135 F.Supp.2d 142, 145–46 (D.P.R.2001). This Court has held the same. *See Lattanzio v.*

*United States*, No. 96–30214–FHF, slip op. at 3–6 (D.Mass. Jan. 21, 1999) (declining to consider whether Vincent Lattanzio, Kiley's co-conspirator, merited section 2255 relief because Lattanzio already had a full and fair opportunity to litigate his Fourth Amendment claims). The Court agrees that applying the exclusionary rule in section 2255 petitions would not deter police misconduct any more than applying the exclusionary rule at trial, but would impose great social costs in allowing Kiley to argue that which he has argued already. *See Stone*, 428 U.S. at 494–95, 96 S.Ct. 3037. Thus, Kiley's "Fourth Amendment exclusionary claims are not subject to collateral attack where a full and fair opportunity to litigate the issue was provided during the primary proceedings." *Owens*, at 136.

The address being plainly evident on the warrant application coupled with Kiley's admitted presence within the house at the time the warrant was executed gave him full knowledge of the facts underlying this claim. This Court held a suppression hearing at which Kiley vigorously contested the validity of the search warrant. Thus, because Kiley had a full and fair opportunity to litigate this point, the Court will deny his Fourth Amendment challenge to the warrant. *See id.*

### E. *Improper Sentencing*

Kiley asserts three claims alleging that he was improperly sentenced as an armed career criminal under the Armed Career Criminal Act of 1984 ("ACCA"), 18 U.S.C. § 924(e). First, Kiley maintains that the government failed to prove that the guilty pleas constituting the previous convictions upon which the Court enhanced Kiley's sentence, were the result of guilty pleas knowingly and intelligently given. *See Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Sec-

ond, Kiley asserts that the government failed to prove his Massachusetts assault and battery conviction was a "violent felony" under the ACCA. Kiley claims to have received ineffective assistance of counsel because his attorney at trial and on appeal failed to contest the sufficiency of the predicate offenses on his behalf. Lastly, Kiley argues that the Court lacks subject matter jurisdiction to enhance his sentence under ACCA, because the grand jury did not charge him under the ACCA and the trial jury did not find the facts of his previous convictions. For the following reasons, each of Kiley's arguments fails.

### 1. *Factual and Procedural Background*

The ACCA increases the prison term for possession of a firearm by a convicted felon from a maximum sentence of 10 years in prison, to a mandatory minimum sentence of 15 years in prison and a maximum of life in prison without parole if the defendant has "three previous convictions ... for a violent felony or a serious drug offense." 18 U.S.C. § 924(e); *see also Custis v. United States*, 511 U.S. 485, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994).

The Court used the three convictions included in the Presentence Investigation Report ("PSI") to enhance Kiley's sentence under 18 U.S.C. § 924(e). The PSI listed the three convictions and accompanying sentences as:

1. Assault and Battery. Sentenced on 3/3/73 to 11 months House of Corrections, sentence suspended, 2 years probation. *See* PSI ¶ 78.
2. Conspiracy to Distribute Cocaine. Sentenced on 5/7/81 to 3 years. *See* PSI ¶ 88.
3. Possession with Intent to Distribute Class B Substance; Possession of Class D Substance. Sentenced on

10/23/81 to 3 to 5 years. *See* PSI ¶ 89.

At trial and on direct appeal, Kiley neither contested nor objected to the convictions included in the PSI nor did he object to the Court's finding that he was an armed career criminal for ACCA purposes.

### 2. *Prior Convictions Obtained By Guilty Pleas as Predicate Offenses Under the ACCA*

Kiley's failures to object at the sentencing proceeding constitute procedural defaults, which require Kiley to show "cause" excusing his procedural defaults as well as "actual prejudice resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 168–69, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (internal quotations omitted); *see also Smullen v. United States*, 94 F.3d 20, 23 (1st Cir. 1996); *Suveges v. United States*, 7 F.3d 6, 10 (1st Cir.1993). The government argues that the Supreme Court's decisions in *Custis*, 511 U.S. 485, 114 S.Ct. 1732, 128 L.Ed.2d 517, and *Daniels v. United States*, 532 U.S. 374, 121 S.Ct. 1578, 149 L.Ed.2d 590 (2001), preclude Kiley from attacking the constitutionality of his prior state convictions, which were used to enhance his sentence under the ACCA. The Court wholly agrees.

In *Custis*, a jury convicted the defendant of possession of a firearm. *See Custis*, 511 U.S. at 488, 114 S.Ct. 1732. The government sought to enhance the defendant's sentence pursuant to the ACCA, 18 U.S.C. § 924(e)(1), based on the prior convictions listed in the notice of sentence enhancement. *See id.* At the sentencing hearing, the defendant challenged two of the predicate state convictions on the grounds that, *inter alia*, he was denied effective assistance of counsel and his guilty pleas related to those prior convictions were not knowingly or intelli-

gently given as required by *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). *See id.* at 496, 114 S.Ct. 1732. The Supreme Court held that the defendant had neither a statutory nor constitutional right to collaterally attack a prior conviction used for sentence enhancement purposes.[22] *See id.* at 497, 114 S.Ct. 1732. The Supreme Court found that ease of administration and the interest in promoting the finality of judgments justified this result in collateral proceedings. *See id.* at 496–97, 114 S.Ct. 1732. It is evident that even if Kiley wanted to, he could not object to the convictions on that ground, even at the sentencing hearing.

The government's position is further bolstered by *Daniels*, 532 U.S. 374, 121 S.Ct. 1578, 149 L.Ed.2d 590, where the Supreme Court extended *Custis* to situations in which a section 2255 petitioner challenges a prior conviction used to enhance his or her sentence. *See Daniels v. United States*, 532 U.S. 374, 121 S.Ct. 1578, 149 L.Ed.2d 590. Like Kiley here, the defendant in *Daniels* complained that the prior convictions were the result of unknowing and involuntary guilty pleas and the product of ineffective assistance of counsel. *See id.* at 377, 121 S.Ct. 1578. The Supreme Court found that the same underlying concerns of ease of administration and the interest in promoting the finality of judgments, which arose in sentencing proceedings, arose in the section 2255 context as well. *See id.* at 379, 121 S.Ct. 1578.

Applying this precedent to the present case, the Court finds that Kiley has already had many opportunities to contest the constitutional validity of his previous convictions on direct appeal, through post-conviction proceedings available under

Massachusetts or federal law, or through a habeas petition brought under 28 U.S.C. § 2254 or a motion to vacate sentence under 28 U.S.C. § 2255. *See id.* at 381, 121 S.Ct. 1578. These "vehicles for review, however, are not available indefinitely and without limitation." *Id.* Thus, Kiley is without recourse, because the prior convictions used to enhance his firearms sentence are "no longer open to direct or collateral attack in [their] own right." *Id.* at 382, 121 S.Ct. 1578. "The presumption of validity that attached to the prior conviction[s] at the time of [Kiley's] sentencing is conclusive, and [he] may not collaterally attack his prior conviction through a motion under § 2255." *Id.* Thus, the Court will deny Kiley's claim that the government failed to prove that his prior convictions were the result of knowingly and voluntarily given guilty pleas. *See id.*

### 3. *Assault and Battery as a Predicate Offense*

■ Kiley next challenges the sufficiency of his Massachusetts assault and battery conviction as a predicate offense for ACCA purposes. Under Massachusetts law, Kiley rightly points out that there are two types of assault and battery, the first involving actual or potential physical harm, the second involving nonconsensual but unharmful touching. *See United States v. Harris*, 964 F.2d 1234, 1236 (1st Cir.1992). Kiley argues that the government never proved at the sentencing proceeding that his Massachusetts assault and battery conviction was of the violent type. Thus, the argument goes, the Court erred in finding him to be a career criminal under the ACCA and in enhancing his sentence. Kiley claims his attorneys rendered ineffective assistance by failing to

---

**22.** The Supreme Court distinguished the defendant's grounds from the "unique constitutional defect" of failure to appoint counsel for an indigent defendant. *See id.* at 496, 96 S.Ct. 3037. This exception is inapplicable to this case.

raise this issue at the sentencing hearing and on appeal.

Kiley cites *United States v. Jones*, 235 F.3d 342, for the broad proposition that, where the PSI uses boilerplate language to describe a Massachusetts assault and battery conviction, and where the government fails to prove that the conviction was for the violent type, a sentencing court may not use the prior conviction to enhance a sentence. *See United States v. Jones*, 235 F.3d 342 (7th Cir.2000). In *Jones*, the Seventh Circuit reviewed the charging documents for the assault and battery conviction, which only stated that the defendant "did assault and beat" the victim. The Seventh Circuit concluded that "no inference regarding whether [the defendant] committed a crime of violence can be drawn from the charging document's use of [that boilerplate] phrase." *Id.* at 347. No other evidence outside the charging document (whose examination would not require a hearing) indicated that the assault and battery conviction was a "crime of violence." *See id.* at 347–48. The Seventh Circuit held the defendant's Massachusetts assault and battery conviction was not a "crime of violence," which effectively disqualified the defendant as a career offender, and remanded the case to the district court for resentencing. *See id.*

While *Jones* encompasses the destination Kiley seeks, namely, that the government must show the conviction was for a violent felony[23] where the defendant contests the sufficiency of the conviction as an enhancement factor, *Jones* is a road completely divergent from Kiley's situation. In *Jones*, the defendant contested the sufficiency of a previous Massachu-

setts conviction for assault and battery as a predicate "crime of violence" under the Sentencing Guidelines *at the sentencing stage*. *See id.* at 343–44. The defendant also brought the issue up again on direct appeal. *See id.* at 345.

In contrast, Kiley presently seeks to *collaterally attack* the Court's use of the Massachusetts assault and battery conviction as a sentencing factor. This difference lifts the weight off of the government, which had the original burden of establishing, by a preponderance of the evidence, at least three convictions as valid ACCA predicates at Kiley's original sentencing, *see United States v. Shepard*, 231 F.3d 56, 68 (1st Cir.2000), and places it squarely onto Kiley, *see Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Cf. Frady*, 456 U.S. at 165–66, 102 S.Ct. 1584 ("An error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment .... To obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal.").

Consequently, Kiley must meet the familiar two-prong test expounded in *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, to lay out an ineffective assistance of counsel claim. *See Smullen*, 94 F.3d at 23. Accordingly, Kiley must satisfy the first prong by demonstrating that "counsel's performance fell below an objective standard of reasonableness." *See id.* "This means that [Kiley] must show that counsel's advice was not within the range of competence demanded of attorneys in criminal cases." *See Knight v. United States*, 37 F.3d 769, 774 (1st Cir.1994) (in-

---

**23.** *Jones* involved the Sentencing Guidelines, which are slightly different than the ACCA; the differences, however, are immaterial here. *See United States v. Dueno*, 171 F.3d 3, 4 (1st Cir.1999) ("authority interpreting the ACCA's

'violent felony' provision is frequently persuasive in interpreting the guidelines' 'crime of violence' provision, and vice versa"), *construing United States v. Winter*, 22 F.3d 15, 18 n. 3 (1st Cir.1994).

ternal quotations omitted). Once Kiley "has identified the acts or omissions of counsel alleged to be ineffective, the reviewing court must reconstruct the circumstances of counsel's conduct and evaluate it from counsel's perspective at the time." *Perron v. Perrin*, 742 F.2d 669, 673 (1st Cir.1984). The Court "must view counsel's actions deferentially." *Knight*, 37 F.3d at 774. Kiley must then satisfy the second-prong by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Kiley neither alleges nor submits evidence that his Massachusetts assault and battery conviction was of the non-violent variety. Instead, Kiley places his complete faith in the fact that the government failed to prove the conviction was the violent variety. The Court finds it is insufficient to argue that Kiley's attorney should have put the government to the test in establishing the violent nature of the felony without actually showing that the result of the sentencing proceeding would have been different. In other words, Kiley must now show either that the conviction was of the non-violent variety or that, had the government been put to the task, it would have failed to show that the assault and battery conviction was of the violent type. A glance at the facts before the Court reinforces that Kiley's position is untenable: Kiley's own trial attorney attests that he discussed the ACCA findings in the PSI, and recalls that Kiley told him that the assault and battery conviction was of the violent type.[24] *See* Government's Opposition (Doc. No. 29), Exhibit D (Graham's Second Aff.).

Because Kiley "makes an insufficient showing" that the result of his sentencing proceeding would have been different, the Court need not address whether counsel's actions fell below the objective standard of reasonableness. *See Strickland*, 466 U.S. at 697, 104 S.Ct. 2052 ("there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one"). Thus, the Court will deny Kiley's ineffective assistance of counsel claims regarding counsels' failures to contest the sentencing enhancement.

### 4. *Subject Matter Jurisdiction*

Citing a slough of constitutional provisions and Supreme Court cases, Kiley argues that the enhanced sentence he received for being convicted as a felon in possession of a firearm is unconstitutional

---

**24.** In an affidavit, Attorney Stewart T. Graham, Jr., the attorney who represented Kiley at both trials and at his sentencing, attests:
 I discussed the above offenses with Mr. Kiley to determine the accuracy of the presentence report and the validity of the above listed convictions. Based on my discussions with Mr. Kiley, I was satisfied that the above offenses, including the assault and battery conviction were valid, and satisfied the criteria for predicate offenses for the armed career criminal classification. In making this statement, I am aware of the distinctions in Massachusetts law between an assault and battery based solely on a non-privileged, non-consensual touching, and one based on a non-privileged, harmful or potentially harmful touching. It is my recollection that the offense was of the latter type. Given the discussions with Mr. Kiley and the conclusions based on those discussions, we did not contest the validity of the convictions nor the classification as an armed career criminal for purposes of sentencing.
 Government's Opposition (Doc. No. 29), Exhibit D (Graham's Second Aff.).

because the grand jury and jury never found beyond a reasonable doubt the facts that he was convicted of the prior offenses that served as the predicates for enhancing his sentence under the ACCA. *See, e.g., United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

Kiley maintains that the indictment returned against him never mentioned his prior convictions. Thus, he argues, the indictment failed to allege each material element of the offense with which he was charged, citing *Cabrera–Teran,* 168 F.3d 141, 143 (1999). Thus, Kiley believes the Court lacked subject matter jurisdiction when it sentenced him to an offense not charged in the indictment, namely, that he was an armed career criminal. *See United States v. Tran,* 234 F.3d 798, 806, 707–808 (2d Cir.2000). Kiley next cites to cases which follow the same pattern: the indictment charges the defendant with one offense, such as robbery, the jury is instructed on other offenses supported by the facts, such as assault with a deadly weapon, and the appellate court overturns the conviction based upon the district court's lack of subject matter jurisdiction. *See Crosby v. United States,* 339 F.2d 743 (D.C.Cir.1964). Lastly, Kiley cites *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, for the broad proposition that a jury must find every fact that increases the statutory punishment of the offense. *See Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Kiley counts the votes in *Apprendi* and deems *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (holding that a prior conviction need not be treated as an element of an offense even if it raises the

maximum statutory penalty), incorrectly decided. Kiley asks to be resentenced as a simple felon in possession without the enhanced sentence. Kiley, however, cites these various lines of cases and construes their holdings much too broadly.[25]

 In Apprendi, the Supreme Court found New Jersey's hate crimes statute violated the due process clause, because it increased the maximum allowable sentence if the trial judge found by a preponderance of the evidence that defendant acted with purpose to intimidate victim because of the individual's race. *See Apprendi,* 530 U.S. at 497, 120 S.Ct. 2348. The exact language of the Supreme Court's holding would seem to preclude Kiley's argument: *"[o]ther than the fact of a prior conviction,* any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348 (emphasis added). Indeed, distinguishing between the facts in that case with the exception carved out by *Almendarez–Torres,* the *Apprendi* Court explained:

Whereas recidivism "does not relate to the commission of the offense" itself, New Jersey's biased purpose inquiry goes precisely to what happened in the "commission of the offense." Moreover, there is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to

---

**25.** The Court also notes that one of the cases Kiley cites in his favor has been overruled. *See United States v. Longoria,* 298 F.3d 367, 372 n. 6 (5th Cir.2002) (to the extent that *Cabrera–Teran* holds that "a defective indict-

ment deprives a court of jurisdiction," it is overruled by *United States v. Cotton,* 535 U.S. 625, 122 S.Ct. 1781, 1785, 152 L.Ed.2d 860 (2002)).

find the required fact under a lesser standard of proof.

*Id.* at 496, 120 S.Ct. 2348 (citations omitted). An "unbroken line of authority" in this Circuit has rejected Kiley's argument. *United States v. Moore,* 286 F.3d 47, 51 (1st Cir.2002), *cert. denied,* — U.S. —, 123 S.Ct. 242, 154 L.Ed.2d 184 (Oct. 7, 2002) (rejecting petitioner's claim that violation of *Apprendi* occurred when judge not jury found facts of prior conviction to determine sentencing under Armed Career Criminal Act). As the First Circuit has recently proclaimed:

> In the post-*Apprendi* era, we have ruled with a regularity bordering on the monotonous that, given the explicit exception and the force of *Almendarez–Torres,* the rationale of *Apprendi* does not apply to sentence-enhancement provisions based upon prior criminal convictions.

*Id.* (citing cases). Undeterred, the petitioner submits that the Supreme Court's subsequent decision in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 overturns *Almendarez–Torres. See Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

Petitioner's reliance on *Ring,* however, is misplaced, as nothing in that case changes *Apprendi's* holding as it applies to sentence enhancement provisions based upon prior criminal convictions. In *Ring,* the Supreme Court held that "[c]apital defendants, no less that non-capital defendants, ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 2432. The Supreme Court made explicit that the petitioner in that case "[did] not challenge *Almendarez–Torres v. United States,* which held that the fact of a prior conviction may be found by a judge even if it increases the statutory maximum sentence." *Id.* at 2437 n. 4

(citations omitted). Thus, this precise issue was not before the Supreme Court in *Ring.* Any reading of *Ring* or any other case in the *Apprendi* line that requires a jury, and not a judge, to find the fact of a prior conviction would also necessitate the removal of every courthouse door from its hinges in order to bear the multitude of petitions that would surely follow seeking relief from an enhanced sentence imposed upon the petition's sender. Absent a more definite directive from the Supreme Court, this Court makes no plans to partake in such a crushing task.

In his Reply to Government's Opposition, Kiley tries to wiggle away from the implications of *Apprendi* by attempting to characterize his as something other than an *Apprendi* argument. Unfortunately, Kiley cannot escape the inevitable conclusion that he seeks relief using the arguments in Apprendi. Accordingly, the Court finds it had subject matter jurisdiction to sentence Kiley as an armed career criminal and will deny his request to resentence him as a simple felon in possession of a firearm.

## V. CONCLUSION

For all of the reasons mentioned, the Court DENIES all of Kiley's requests for relief.